UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STATE OF OHIO, Opportunities
For Ohioans with Disabilities, Bureau
of Services of Visually Impaired,
Business Enterprise Program

        Petitioner,

      **v.**

UNITED STATES DEPARTMENT
OF EDUCATION, REHABILITATION
SERVICES ADMINISTRATION, *et al.*,

        Respondent.

Case No. 2:17-cv-873
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Petitioner State of Ohio, Opportunities for Ohioans with Disabilities, Bureau of Services for the Visually Impaired, Business Enterprise Program's ("BSVI") Motion for Judgment on the Administrative Record (ECF No. 23); Intervenor-Respondent James Cyrus's ("Mr. Cyrus") Motion to Enforce Arbitration and Memorandum in Opposition to Petitioner's Motion for Judgment on the Administrative Record (ECF No. 28); BSVI's Reply brief (ECF No. 29); Mr. Cyrus's Reply brief (ECF No. 31); and Mr. Cyrus's Motion to Supplement the Administrative Record Filed by Petitioner (ECF No. 32). For the reasons set forth below:

1) BSVI's Motion for Judgment on the Administrative Record (ECF No. 23) is **GRANTED in part and DENIED in part**;

2) Mr. Cyrus's Motion to Enforce Arbitration (ECF No. 28) is **GRANTED in part and DENIED in part**; and

3) Mr. Cyrus's unopposed Motion to Supplement the Administrative Record (ECF No. 32) is **GRANTED**.

## I.

### A. Randolph-Sheppard Act & Mini Randolph-Sheppard Act

Congress enacted the Randolph-Sheppard Act ("the Act") in 1936 to "provide blind persons with remunerative employment, enlarge their economic opportunities and stimulate them to greater efforts in becoming self–supporting." 117 A.L.R. Fed. 503, §2 (1994). The Act, as amended, authorizes qualified individuals to operate vending facilities on federal property. *Id.* (citing 20 U.S.C. § 107(a)). To facilitate the blind vendor program, the Act divides responsibilities between state and federal agencies. *Tennessee Dep't of Human Services v. U.S. Dep't of Education.*, 979 F.2d 1162, 1163 (6th Cir. 1992). The Secretary of the United States Department of Education, "who is responsible for interpreting and enforcing the Act, designates a state agency to issue licenses to qualified blind persons." 117 A.L.R. Fed. 503, §2 (1994). In turn, the state licensing agencies issue licenses to qualified vendors and equip vending facilities. *Id.*

Some states, including Ohio, have passed Mini Randolph-Sheppard Acts to expand priority vending to state properties. *See* 33 O.R.C. §§ 3304.28–3304.35. Under Ohio's Mini Randolph-Sheppard Act, blind vendors have priority to operate on all "governmental property"—including "any real property, building, or facility owned, leased, or rented by the state or any board, commission, department, division, or other unit or agency thereof." 33. O.R.C. § 3304.28(C).

In addition to granting blind vendors priority to government facilities, both the Act and the Mini Act provide a method for addressing grievances. Under the Act, dissatisfied vendors have

2

access to "an evidentiary hearing before the state agency and arbitration before a panel convened by the Secretary." 117 A.L.R. Fed. 503 (1994). The Mini Act provides for a hearing before a board comprised of: (1) a designee of BSVI, (2) a designee of the entity adversely affected, and (3) mutually-accepted third party. 33. O.R.C. § 3304.32. If a licensee is not satisfied with the result of the hearing, it may file an administrative appeal pursuant to Chapter 119.12 of the Ohio Revised Code. *Id.*

### B. Mr. Cyrus's Grievances Against BSVI

Mr. Cyrus is a licensed blind vendor who operates vending facilities in Toledo, Ohio, pursuant to the Act and the Mini Act. (Cyrus Hearing Exhibit 4, ECF No. 20-49). Mr. Cyrus first became a Randolph-Sheppard vendor in 1989. (Agency Hearing Tr. 125:7–13, ECF No. 20-1). In 1992, Mr. Cyrus began operating vending facilities at several locations in Lucas County (also "the County"), including the Lucas County Corrections Center, the Lucas County Work Release Program, the Adult Treatment Center, the Youth Treatment Center, and the Lucas County Probation Department. (*Id.* at 129:1–9). In addition, Mr. Cyrus began providing vending services at the University of Toledo (also "the University") Health Science Campus. (*Id.*).

As the designated Ohio agency responsible for implementing the Act and Mini Act, BSVI is also responsible for overseeing Mr. Cyrus's vending operations. (*Id.* at 70:16–71-8). BSVI is a division of Opportunities for Ohioans with Disabilities ("OOD"). The blind vendor program set up by OOD and overseen by BSVI is known as the "Business Enterprise Program." (*Id.*). To facilitate the Business Enterprise Program, OOD negotiates Bureau Grantor Agreements with state or federal entities for the purpose of establishing blind vending facilities. (*Id.* at 71:14–72:15). OOD has the ability to enter Bureau Grantor Agreements with federal, state, county, municipal, and private locations. (*Id.* at 71:14–72:22). In addition, OOD executes Bureau Operator

3

Agreements with vendors to establish the requirements "to manage their facilities, [comply] with the statute, [comply] with whatever Bureau Grantor Agreements are involved with their facility, and [detail] other duties that they are to follow." (*Id.* at 71:19–25).

In connection with the vendor sites operated by Mr. Cyrus, OOD executed Bureau Grantor Agreements with the University and Lucas County in 2006 and 2011 respectively. (*Id.* at 75:1–19). The Bureau Grantor Agreement between OOD and the University of Toledo contained a provision requiring vendors to make commission payments directly to the University. (Exhibit 19 at 397, ECF No. 20-19). Specifically, provision 11(a) read as follows:

11. Commission and Debit Card Reimbursement.

(a) In order to partially reimburse the University for utilities, data lines, and other amenities it provides to the Contractor in connection with the vending services provided by the Contractor under this Agreement, the Contractor, through the operator, shall pay to the University a 7% commission on gross sales less food and pastry sales representing vending revenue it obtains from the Vending Service Locations on the Campus (the "Commission"). The Commission shall be paid to the University on or before the 15th day of each month based up the previous month's gross sales, less sales tax and shall be deposited in a band account designated by the University.

(*Id.*) (emphasis in original). The Bureau Grantor Agreement between OOD and Lucas County included a similar provision, requiring the vendor to pay a commission directly to the County. (Exhibit 23-1 at 899, ECF No. 20-26). The amount of the commission that Mr. Cyrus paid varied by the vending location in Lucas County. (*Id.* at 886–894).

On March 19, 2010, Mr. Cyrus signed a Bureau Operator Agreement with ODD regarding his operation of a vendor facility at the University of Toledo (i.e., facility #304). (*Id.* at 385). Under the terms of the Bureau Operator Agreement, Mr. Cyrus agreed to "[c]omply with all provisions of the Ohio Administrative Code Chapter 3304:1-21, including but not limited to operating the BEP Facility in accordance with said

Administrative Code, Bureau-Grantor Agreement, facility permit(s), and any other agreements related to the facility." (*Id.*).

The Lucas County Bureau Operator Agreement, executed in 1993, contained a similar provision. (*Id.* at 847–850). Under the terms of that contract, Mr. Cyrus agreed to "operated the facility in accordance with the requirements of the Bureau-Grantor Agreement, facility permit, or other BSVI contract for the facility." (*Id.* at 847). As required by the Bureau Grantor Agreements, Mr. Cyrus paid his commissions on time. (Agency Hearing Tr. 76:7–9). According to his testimony, Mr. Cyrus estimates that he paid at least $504,000 in commissions during his time as a licensed vendor. (*Id.* at 49:25–50:4) (see also Exhibit 23-1 at 943, ECF No. 20-49).

On March 14, 2014, the Ohio Attorney General issued Opinion 2014-008 ("AG Opinion") regarding the legality of obligating blind vendors to pay commissions out of their gross vending revenues. (Exhibit 17-1 at 432, ECF No. 20-19). The AG Opinion concluded: "BSVI has no authority, under the current statute or rules, to collect commission payments based on the sales of a vending facility from a blind vendor and pay those commissions to a college or university." (*Id.* at 438). This conclusion was specific to any "state university, medical university, technical college, state community college, community college, university branch district, or state affiliated college or university," and did not concern any other type of vending property. (*Id.*).

Mr. Cyrus filed a grievance against OOD on April 29, 2014 to challenge the commission payments. (Exhibit 17-1 at 408, ECF No. 20-19). Citing the AG Opinion, Mr. Cyrus stated: "the BSVI has no legal authority to charge these commissions or to remit them to these government entities, including state or state affiliated colleges and

5

universities." (*Id.*). Mr. Cyrus further stated: "[c]ollection of all these unlawful commission charges should be immediately halted. I also wish to grieve the unlawful imposition of these charges in past years and demand reimbursement of all unlawfully imposed charges." (*Id.*). During his agency hearing, Mr. Cyrus testified that he discontinued his commission payments to the University of Toledo on May 12, 2014. (Agency Hearing Tr. 40:2–7).

On May 28, 2014, OOD sent the University of Toledo a letter informing it that, pursuant to the AG Opinion, "the requirement in the contract to pay commissions is void and can longer be part of the agreement." (*Id.* at 411). Despite receiving notification of OOD's letter, Mr. Cyrus declined to withdraw his grievance. (Agency Hearing Tr. 85:1–86:1). The matter proceeded to an administrative hearing in February 2015. On February 25, 2015, the hearing officer issued a report and recommendation that Mr. Cyrus's grievance be denied. (Exhibit 17-1 at 422, ECF No. 20-19). In the hearing officer's view, "[a]s BE-BSVI did not receive the funds which were paid to third parties equity suggests that it is the third parties who should reimburse Mr. Cyrus." (*Id.* at 421). The Deputy Director of BSVI approved the recommendation in March 2015. (*Id.* at 425).

In response, Mr. Cyrus filed a Complaint with the Secretary of the Department of Education to request an arbitration of his claims. (Exhibit 3 at 250–251, ECF No. 20-3). Seeking compensatory damages for financial losses, Mr. Cyrus aggrieved that BSVI acts and omissions violated the Act and the Mini Act. (*Id.* at 251). On October 14, 2016, OOD and the University of Toledo amended their Bureau Grantor Agreement to remove the requirement that blind vendors pay commissions to the University. (Exhibit 23-1 at 70, ECF No. 20-27). The arbitration panel ("the Panel") conducted a motion hearing on

6

December 12, 2016. (Mot. Hearings Tr., ECF No. 20-22). On January 27, 2017, the case proceeded to a hearing on the merits. (Arb. Hearing Tr., ECF No. 20-25).

## C. The Panel's Decision

On August 8, 2017, the Panel Majority issued an Opinion and Award in favor of Mr. Cyrus. (*See generally* Arb. Op. & Award at 1–36, ECF No. 20-43). The Panel Majority granted Mr. Cyrus the following relief: (1) a declaration "that it is impermissible under the Randolph Sheppard Act and the Mini Randolph Sheppard Act . . . to compel blind vendors to pay commissions for the operation of vending facilities under Bureau Grantor Agreements with state or county entities[;]" (2) a declaration that BSVI violated the Act and the Mini Act "by requiring Cyrus to pay commissions under the 2010 Bureau-Operator Agreement to the University of Toledo and to Lucas County[;]" (3) prospective relief; (4) monetary relief for commissions paid from 2010 to 2016; (5) pre and post judgment interest on the monetary relief; and (6) attorney fees. The prospective relief awarded by the Panel Majority included: (1) enjoining BSVI from requiring Mr. Cyrus to pay commissions under the 2010 Bureau Operator Agreement or taking other adverse action against Mr. Cyrus for non-payment, (2) notifying all grantors that commission payments are now void, and (3) publishing notice to all state or state-affiliated universities that BSVI will enforce 33 O.R.C. §3304.30–3304.33 going forward.

One member of the Panel filed a dissenting opinion. (*See* Arb. Op. & Award at 37–42, ECF No. 20-43). The dissent agrees with the Panel Majority's factual findings. (*Id.* at 37). However, the dissent disagrees with the Panel Majority's "application of law to the facts of this case as expressed in the section entitled **AWARD** commencing on page 33." (*Id.*) (emphasis in original). First, the dissent contends the prohibition on commissions should not apply to counties because the AG Opinion only addresses "commissions paid to a state university, medical

7

university, technical college, state community college, community college, university branch district or state affiliated college or university." (*Id.*). Second, the dissent avers that any prospective relief should not apply to counties. (*Id.* at 38). Third, the dissent contends that the Panel lacks the authority to award monetary relief to Mr. Cyrus because "there has been no consent by the State of Ohio to waive sovereign immunity under the 11th amendment." (*Id.* at 38–39). Fourth, the dissent argues the award of pre and post judgment interest is improper for the reasons stated above. (*Id.* at 41). Finally, the dissent claims there are no "special circumstances" present which justify the award of attorney fees under the American Rule. (*Id.* at 42).

BSVI filed the instant action on May 15, 2018, challenging the Panel Majority's judgment. (Mot. for J. on Admin. Rec., ECF No. 23). BSVI asserts three arguments. First, the monetary damages award was improper because sovereign immunity applies to Article I proceedings and the State did not waive it. (*Id.*). Second, attorney fees are barred by sovereign immunity or are otherwise unavailable under the Act. (*Id.*). Third, BSVI avers that the Panel's decision was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." (*Id.* at 11). On June 29, 2018, Mr. Cyrus filed a Motion to Enforce the Arbitration Award jointly with his Response in Opposition. (Mot. to Enforce, ECF No. 28). BSVI filed a Reply brief on July 27, 2018. (ECF No. 29). A month later, Mr. Cyrus filed his own Reply brief and moved to supplement the administrative record. (ECF Nos. 31 & 32). On September 5, 2018, BSVI filed a response indicating that it does not oppose Mr. Cyrus's Motion to Supplement the Administrative Record. (ECF No. 33). All motions are ripe for review.

8

## II.

### A. Does Sovereign Immunity Apply to Article I Proceedings Under the Act?

The Eleventh Amendment of the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As held by the Supreme Court in *Hans v. Louisiana*, 134 U.S. 1, 13 (1890), "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual [state] without its consent." Thus, a "[plaintiff] cannot sue the state without its permission." (*Id.* at 1). In addition, where a plaintiff seeks to impose "liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (citing *Kennecott Copper Corp. v. State Tax Commission et al.*, 327 U.S. 573 (1946)). However, state sovereign immunity is not absolute. Congress may abrogate a state's sovereign immunity with "a clear legislative statement" and appropriate constitutional authority. *Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996) (citing *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775, 784 (1991)).

BSVI contends that sovereign immunity bars the Panel Majority's award of monetary damages to Mr. Cyrus. (Mot. for J. on the Admin. Rec. at 12). Citing *Federal Maritime Commission v. South Carolina State Ports Authority et al.*, 535 U.S. 743 (2002), BSVI argues that sovereign immunity applies to Article I administrative proceedings such as the one at issue. (*Id.* at 13). According to BSVI, the Supreme Court's decision in *Federal Maritime* overturned *Tennessee Dept. of Human Services*, 979 F.2d 1162, where the Sixth Circuit held that the Eleventh Amendment did not prevent an arbitration panel from rendering a damages award. Consequently, BSVI avers the Court's "determination goes to whether OOD waived its immunity, not to whether

9

an Article I proceeding is the type of proceeding to which immunity applies." (*Id.* at 15). Moreover, BSVI argues that state participation in the blind vendor program does not constitute a waiver of sovereign immunity with respect to monetary damages. (*Id.* at 16). BSVI relies on *Sossamon v. Texas*, 563 U.S. 277, 284 (2011), in which the Supreme Court held that "[a] State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute. Waiver must not be implied." Here, BSVI contends no such waiver exists. (Mot. for J. on Admin. Rec. at 16).

In Mr. Cyrus's view, BSVI's arguments are "based on an overly-broad, overly simplistic, and erroneous reading of the Sixth Circuit's decision in *Tennessee Department of Human Services v. U.S. Dept. of Educ.*, 979 F.2d 1162 (6ᵗʰ Cir. 1992) and the U.S. Supreme Court's subsequent decision in *Federal Maritime Commission v. South Carolina State Port Authority*, 535 U.S. 743, [(2002)]." (Mot. to Enforce at 31–32). Specifically, Mr. Cyrus argues that *Federal Maritime* is distinguishable from the Sixth Circuit's holding in *Tennessee Dept. of Human Services.* (*Id.* at 40). According to Mr. Cyrus, the Supreme Court's "decision in *Federal Maritime Commission* was predicated on the unique characteristics of the FMC's statutory authority under the Shipping Act, which permitted private parties to file complaints against an unconsenting state." (*Id.* at 39). In contrast, Mr. Cyrus points out that BSVI was not coerced into arbitration because, under the terms of the Act, it consented to arbitration when it sought designation as a state licensing agency. (*Id.* at 39–40). Thus, Mr. Cyrus maintains that Ohio waived its sovereign immunity with respect to both the arbitration and monetary damages by "written consent in an application to become a state licensing agency." (*Id.* at 40).

As an initial matter, the Court notes the Panel Majority's decision is "subject to appeal and review as a final agency action for purposes of chapter 7 of such title 5." 20 U.S.C. § 107(d)-2(a).

Pursuant to the Administrative Procedure Act ("APA"), the reviewing court must "hold unlawful and set aside agency actions, findings, and conclusions found to be[:]"

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law; [or]
>
> (E) unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706. Reviewing courts generally defer to interpretations of statutes made by the agencies charged with enforcing them. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, et al.*, 467 U.S. 837, 844 (1984) ("[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations").

BSVI maintains the Court should not award the Panel Majority's decision *Chevron* deference because the Act does not grant the Panel interpretive authority. In support of its view, BSVI *cites Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012), where the Ninth Circuit found that "[d]eference is inapplicable here because the Act does not delegate interpretive authority to the arbitration panel; instead, it gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations." The *Sauer* court also noted that "an arbitration panel is composed of members appointed by the parties to the arbitration, not of

11

Department of Education officials whose expertise merits . . . deference." *Id.* (citing *Mead Corp.*, 533 U.S. at 228). Mr. Cyrus does not address the standard of review in his briefs.

The Sixth Circuit has not yet ruled on whether an arbitration panel convened for the purpose of deciding a Randolph-Sheppard dispute should be awarded *Chevron* deference. Moreover, a brief review of the case law in other circuits suggests the question remains unsettled.[1] The Court declines to determine the appropriate standard of review. Turning to the narrow facts at issue, the Court finds that such a determination is unnecessary in this case. First, this action turns on a question of constitutional law (i.e., sovereign immunity under the Eleventh Amendment), not an issue of agency interpretation. Second, as discussed below, the Court would reach the same result applying a deferential or *de novo* standard.

In *Federal Maritime*, the Supreme Court narrowly held that FMC proceedings are entitled to sovereign immunity, therefore "bar[ring] the FMC from adjudicating complaints filed by a private party against a nonconsenting State." *Federal Maritime*, 535 U.S. at 760. The Supreme Court did not unequivocally award sovereign immunity to all Article I proceedings against a state agency. Instead, the *Federal Maritime* court examined the similarities between the FMC's adjudicative procedures and those found in judicial proceedings. *Id.* at 757. The Court found: (1) FMC's rules of procedures "bear a remarkably strong resemblance to civil litigation in federal

---

[1] A Circuit split exists regarding the applicability of *Chevron* deference. In *Sauer*, 668 F.3d at 650, the Ninth Circuit held that *Chevron* deference does not apply to arbitration decisions under the Act. Likewise, the Third Circuit awards no deference to Randolph-Sheppard arbitration panel decisions. *Del. Dep't of Health & Soc. Servs. v. U.S. Dep't of Educ.*, 772 F.2d 1123, 1139 (3d Cir. 1985) ("Because under 20 U.S.C. § 107d-2(a) and 5 U.S.C. § 706(2)(A) our decision on legal questions is plenary, on [the question as to whether monetary damages is an appropriate remedy] we owe the arbitrators no deference").

However, in *NISH; Goodwill Services, Inc. v. Cohen*, 247 F.3d 197, 202 (4th Cir. 2001), the Fourth Circuit held that "[w]hen, as here [in the context of the Randolph-Sheppard Act], an agency, such as DOE, is charged with implementation of a statute, its policy decisions are entitled to deference." The First Circuit adopted neither view in *New Hampshire v. Ramsey*, 366 F.3d 1, 30 n.25 (1st Cir. 2004) ("We need not resolve this dispute over the appropriate level of deference because we affirm the district court's decision to uphold the arbitration panel's interpretation, regardless [of] whether any deference applies").

courts, (2) "discovery in FMC adjudications largely mirrors discovery in federal civil litigation," and (3) the role of the Administrative Law Judge ("ALJ") "is similar to that of an Article III judge." *Id.* at 757–759. In addition, the Court considered whether the state consented to the adjudication. *Id.* at 760 ("Private suits against nonconsenting States . . . present 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties,' regardless of the forum") (quoting *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). Given its "interest in protecting States' dignity and the strong similarities between FMC proceedings and civil litigation," the Court held that sovereign immunity applied under these facts. *Id.* at 760.

Accordingly, *Federal Maritime* abrogated the Sixth Circuit's holding in *Tennessee Dept. of Human Services*. *See Ramsey*, 366 F.3d at 30 n.19 (citing *Tennessee Dept. of Human Services* but acknowledging "the reasoning behind the court's first holding [that sovereign immunity only applies in Article III proceedings] has since been overruled in *Fed. Mar. Comm'n*, 535 U.S. at 760–761"). In sum, sovereign immunity bars Article I proceedings where: (1) the adjudicative procedures mirror those of Article III courts, and (2) the state does not waive sovereign immunity by consenting to the adjudication.

### 1. Did the Administrative Procedures Trigger Sovereign Immunity?

An administrative arbitration that "walks, talks, and squawks" like a judicial proceeding triggers the protections of sovereign immunity. *Federal Maritime*, 535 U.S. at 757. BSVI contends that the Panel members acted like judges by "making evidentiary rules, controlling the presentation of evidence and argument, ruling on motions, and issuing a decision." (Mot. for J. on Admin. Rec. at 16). Furthermore, BSVI claims the "arbitration was adversarial," much like a judicial proceeding in federal court. (*Id.*). In his Reply brief, Mr. Cyrus argues the arbitration was

"a far cry from any accepted adjudicative process." (Mr. Cyrus Reply at 3). Specifically, Mr. Cyrus points out that the Act permits each party to select an arbitrator—unlike other agency arbitrations where appointed judicial officers preside. (*Id.*). Mr. Cyrus also avers "the state is not required to file an answer to the arbitration complaint, there is no provision for default, and there is no discovery prior to arbitration." (*Id.*).

In *Tyler v. United States Dept. of Edu. Rehabilitation Services Admin.*, 904 F.3d 1167, 1188–1192 (10th Cir. 2018), *cert. denied*, 2019 WL 659881, No. 18–850 (2019), the Tenth Circuit held that sovereign immunity extends to arbitration proceedings under the Act. Examining the similarities to Article III proceedings, the *Tyler* court found that "[a]lthough ad hoc panels—rather than ALJs—arbitrate vendor complaints under the RSA, the role of the RSA panel—like that of the ALJ—is 'functionally comparable' to that of a judge.'" *Id.* at 1190 (citing *Federal Maritime*, 535 U.S. at 756). Nor did state's inability to enter a default judgment persuade the Tenth Circuit that sovereign immunity does not apply. *Id.* at 1191. The *Tyler* Court stated: "[a]n SLA may decline to file an answer . . . without incurring a default judgment against it, and yet it would still be hard-pressed to decline to participate in the arbitration proceeding in its entirety." *Id.* Finally, the Tenth Circuit compared the relative informality of a Randolph-Sheppard arbitration proceeding to that of an FMC arbitration in *Federal Maritime. Id.* at 1192. Finding no glaring dissimilarities, the Tyler court concluded that "RSA and Article III proceedings are sufficiently similar to warrant extending sovereign immunity to the former context." *Id.*

This Court agrees with the Tenth Circuit's analysis. For one, the Supreme Court recently denied *certiorari* in *Tyler*, suggesting the Tenth Circuit reached an accurate conclusion. In addition, although Mr. Cyrus briefly addresses the *Federal Maritime* factors in his Reply brief, the parties focus their arguments on the question of waiver. Consequently, the Court assumes,

*arguendo*, that sufficient similarities exist between the arbitration below and Article III proceedings to trigger sovereign immunity. It will next consider whether BSVI waived sovereign immunity with respect to appearing before the Panel.

### 2. Did BSVI Waive Sovereign Immunity with Respect to the Arbitration?

A state cannot be coerced into arbitration against its will. *Federal Maritime*, 535 U.S. at 760. As stated by the Supreme Court, "if the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency." *Id.* Moreover, to waive sovereign immunity, "[a] State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute.'" *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Pennhurst State School & Hospital v. Halderman et al.*, 465 U.S. 89 (1984). "Waiver may not be implied." *Id.* (citing *College Savings Bank v. Florida Prepaid Postsecondary Edu. Expense Board et al.*, 527 U.S. 666 (1999). However, "[a] state can waive its immunity explicitly when it opts to participate in a federal program in which Congress clearly has conditioned participation on such a waiver." *Edelman v. Jordan*, 415 U.S. 651, 673–674 (1974).

The language of the Act conditions state participation in the blind vendor program on the agreement to arbitrate disputes. Specifically, the Act provides in pertinent part:

(a) Hearing and Arbitration

Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d–2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107(d)-1(a). The Act further mandates that:

> A State agency for the blind or other State agency desiring to be designated as the licensing agency shall, with the approval of the chief executive of the State, make application to the Secretary and agree—
>
> (6) to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration as provided in section 107d–1 of this title.

20 U.S.C. § 107(b).

Numerous circuits have acknowledged that states consent to participate in arbitration when they apply to operate a blind vendor program. *See Delaware Dept. of Health & Social Services v. United States Dept. of Edu.*, 772 F.2d 1123 (3rd Cir. 1985) (considering what remedies arbitration panels are permitted to grant under the Act); *Georgia Dept. of Human Resources v. Nash*, 915 F.2d 1482 (11th Cir. 1990) (same); *Tyler*, 904 F.3d at 1186 (only analyzing waiver with respect to the arbitration panel's award of monetary relief, not waiver with respect to hearing the case). The Sixth Circuit itself has noted, "[t]he natural reading of [the Act] is that the arbitration panel may consider and resolve any complaint of a vendor arising out of the program, including a complaint that the state agency has taken money to which the vendor is entitled."[2] *Tennessee Dept. of Human*

---

[2] The dissenting Panel member argues Ohio has not explicitly waived its sovereign immunity concerning the arbitration action. In his or her Dissenting Opinion on BSVI's Motion to Dismiss, the member averred: "the Eleventh Amendment bars not only a monetary award [but even] an action for monetary damages in this arbitration panel because the State of Ohio has certainly not explicitly or clearly consented to such an award in other than an action in the Court of Claims." (Dissenting Opinion on Mot. to Dismiss at 6, ECF No. 20-24; adopted by Arb. Op. & Award, ECF No. 20-43). Citing *Tennessee Dept. of Human Services*, 979 F.2d at 1168, the Dissent points out the Sixth Circuit stated: "The text of the Randolph-Sheppard Act reflects neither an unmistakable intention by Congress to abrogate the states' sovereign immunity nor a clear statement that participation in the program will constitute a waiver of immunity."

This Court finds the Dissent's quote inapplicable here for several reasons. First, the *Tennessee Dept. of Human Services* court did not consider whether the state entity waived sovereign immunity to appear before an arbitration panel. Second, the Dissent takes this quote out of context. In the paragraph immediately preceding the quote, Sixth Circuit stated: "By contrast, the Randolph-Sheppard Act contains no mention of retroactive liability or of states' liability for, or immunity from, damages. A mere reference to binding arbitration in the Act does not unmistakably suggest that a vendor will be able to collect retroactive damages in federal court or that a state will

*Services*, 979 F.2d at 1165. Finally, BSVI concedes that "OOD is subject to arbitration pursuant to the Randolph-Sheppard Act." (BSVI Reply at 8).

Accordingly, this Court agrees with the Panel Majority that "the State of Ohio has not been 'hauled' into an arbitration proceeding without its consent." (Majority Opinion on Mot. to Dismiss at 9, ECF No. 20-23; adopted by Arb. Op. & Award, ECF No. 20-43). BSVI's voluntary participation in the blind vendor program was a sufficient waiver of sovereign immunity with respect to appearing before the Panel.

### 3. Did BSVI Waive Sovereign Immunity with Respect to Monetary Damages?

Next, the Court turns to the central issue in the parties' dispute—whether BSVI's participation in the blind vendor program was also a sufficient waiver of immunity from monetary damages. BSVI argues the text of the Act provides no language supporting a waiver of immunity for damages. (Mot. for J. on Admin. Rec. at 16). Citing *Sossamon*, 563 U.S. at 285, BSVI notes that "[t]he Supreme Court held that even a statute that provides for relief as broad as 'appropriate relief against a government' will not act to waive a state's immunity to money damages for violations of the statute." Furthermore, BSVI contends the absence of explicit language in the Act runs "in stark contrast to other federal statute where Congress expressly waives Eleventh Amendment immunity for money damages." (Mot. for J. on Admin. Rec. at 18) (citing 42 U.S.C. § 2000(d)-7(a); providing that a state shall not be immune from remedies both at law and in equity).

Mr. Cyrus contends that sovereign immunity does not constitute a bar on the Panel Majority's monetary award. (Mot. to Enforce at 41). Citing *Pennhurst*, 451 U.S. at 17, Mr. Cyrus argues "Congress may condition a state's participation in a federal program or activity on the state's waiver of immunity." (*Id.*) (*See also Parden v. Terminal Ry*, 377 U.S. 1874 (1964)). In

---

surrender its sovereign immunity." *Id.* Consequently, this Court interprets the quote to refer to the state's waiver of sovereign immunity from monetary damages—not a waiver from arbitration itself.

addition, Mr. Cyrus relies on *Tennessee Dept. of Human Services*, 979 F.2d at 1165, where the Sixth Circuit asserted that an arbitration panel may "resolve any complaint of a vendor arising out of the program, including a complaint that the state agency has taken money to which the vendor is entitled." Mr. Cyrus also cites persuasive authority to support his position that state participation in the blind vendor program constitutes a waiver of immunity from monetary damages. *Premo v. Martin*, 119 F.3d 764, 769 (9th Cir. 1997) ("It has been widely recognized that [the] language of [the Act] permits arbitration panels to award compensatory relief"); *Morris v. State of Maryland*, 908 F.2d 967, 967 (4th Cir. 1990) (In dicta, stating "[i]t is doubtful whether eleventh amendment immunity would be available to the State [in a claim for compensatory damages asserted by a blind vendor]"). Finally, Mr. Cyrus argues the State waived its immunity from monetary damages through its pre-litigation conduct. (Mot. to Enforce at 50) (citing *Board of Trustees Sabis Intern School v. Montgomery*, 205 F. Supp. 2d 835, 845–846 (S.D. Ohio 2002) ("the Court concludes that the State's pre-litigation act of inserting a binding arbitration provision into the contract constitutes a waiver of the State's Eleventh Amendment immunity")).

BSVI's arguments are well taken. In *Sossamon*, 563 U.S. at 286, the Supreme Court considered whether states that accept funding under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") automatically waive sovereign immunity as to damages. The Court found that RLUIPA's express authorization of "appropriate relief" is too "open-ended and ambiguous" to extend to monetary damages. *Id.* Thus, the Court held "RLUIPA is not so free from ambiguity that we may conclude that the States, by receiving federal funds, have unequivocally expressed intent to waive their sovereign immunity to suits for damages." *Id.* at 288. Citing *Lane v. Peña*, 518 U.S. 187, 192 (1996), the *Sossamon* court remarked: "a waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'"

18

*Id.* at 285. Moreover, the Court stated: "a waiver of sovereign immunity to other types of relief

**does not waive immunity to damages**: '[T]he waiver of sovereign immunity must extend

unambiguously to such monetary claims.'" *Id.* (emphasis added).

The Panel Majority did not cite *Sossamon* in its Opinion and Award. Instead, the Panel

Majority analyzed immunity from damages as follows:

> The conclusion that the Panel may award damages against the Bureau under
> Randolph Sheppard is supported by *Premo v. Martin*, 119 F.3d 767, 770 (9th Cir.
> 1997); *Del. Dep['Jt of Health and Soc'l Servs. v. U.S. Dep't of Educ.*, 772 F.2d
> 1123, 1136–1137 (3d Cir. 1985[)]; *Committee of Blind Vendors of District of
> Columbia v. District of Columbia*, 736 F. Supp. 292, 308 (D.D.C. 1990) (following
> *Delaware Dep't of Health and Soc'l Servs.* and declining to follow *McNabb*). *See
> also Morris v. State of Maryland*, 908 F.2d 967 (4th Cir. 1990) (stating in dicta that
> it is doubtful that the eleventh amendment would bar the recovery of damages by
> blind vendors in a Randolph Sheppard proceeding, citing *Delaware Dep't of Health
> and Soc'l Servs.*); and *Tamashiro v. Department of Human Services, State of
> Hawaii*, 146 P.3d 103, 118–119 (Hawaii 2006) (citing with approval the holding in
> *Premo* that "[t]he overwhelming implication of the statute is that by agreeing to
> participate in the [Randolph Sheppard] program states have waived their sovereign
> immunity to enforcement of such [damages] awards in federal courts. 119 F.3d at
> 770").

(Majority Opinion on Mot. to Dismiss at 9, ECF No. 20-23; adopted by Arb. Op. & Award, ECF

No. 20-43). The Panel Majority further relied on *Tennessee Dept. of Human Services*, 979 F.2d at

116, where the Sixth Circuit found that a Randolph Sheppard arbitration panel may award a

monetary damages award—but sovereign immunity bars federal courts from enforcing such an

award. (Majority Opinion on Mot. to Dismiss at 4–5; adopted by Arb. Op. & Award). The

*Tennessee* court stated:

> We conclude, therefore, that while the Eleventh Amendment does not prevent the
> arbitration panel from rendering its award [to the blind vendor], any attempt by [the
> blind vendor] to enforce the award in federal court necessarily implicates the
> Eleventh Amendment.

(*Id.*) (citing *Tennessee Dept. of Human Services*, 979 F.2d at 116).

The Court finds Mr. Cyrus's reliance on *Tennessee Dept. of Human Services* misplaced. *Tennessee Dept. of Human Services*, as well the persuasive cases cited by Mr. Cyrus and the Panel Majority, were decided pre-*Sossamon*.[3] Furthermore, because *Tennessee Dept. of Human Services* was decided pre-*Federal Maritime*, the *Tennessee* court did not analyze whether the state waived sovereign immunity with respect to either arbitration or monetary damages. As discussed *supra*, the *Tennessee* court merely found that sovereign immunity does not apply in Article I proceedings—a rule which was later abrogated by the Supreme Court in *Federal Maritime*. Accordingly, the Court must apply *Sossamon* to determine if Ohio waived its immunity from monetary damages in the instant action.

The Court turns to the Tenth Circuit's post-*Sossamon* decision for guidance. *Tyler*, 904 F.3d 1167. Applying *Sossamon* to arbitration under the Act, the *Tyler* court held "that the RSA is insufficiently explicit to render state participation in the RSA Program a waiver of sovereign immunity from an RSA arbitration panel award for damages." *Id.* at 1193. Specifically, the Tenth Circuit noted the Act "is silent as to what remedies aggrieved vendors may obtain against SLAs and is therefore just as 'open-ended and ambiguous' as RLUIPA, if not more." *Id.* Consequently, the *Tyler* court held the arbitration panel exceeded its authority by granting the blind vendor monetary damages. *Id.*

The Court finds *Tyler* persuasive. As the Tenth Circuit averred, the Act permits a blind vendor to "file a complaint with the Secretary who shall convene a panel to arbitrate the dispute . . . and the decision of such panel shall be final and binding on the parties except as otherwise

---

[3] The Supreme Court decided *Sossamon*, 563 U.S. 277, in 2011. The Sixth Circuit decided *Tennessee Dept. of Human Services*, 979 F.3d 1162, in 1992. Moreover, the Ninth Circuit decided *Premo*, 119 F.3d 767, in 1997; the Fourth Circuit decided *Morris*, 908 F.2d 967, in 1990; and the Third Circuit decided *Del. Dep[']t of Health and Soc'l Servs. v. U.S. Dep't of Educ.*, 772 F.2d 1123, in 1985.

provided in this chapter." 20 U.S.C. § 107(d)-1(a). Unlike the language of RLUIPA (i.e., the statute considered in *Sossamon*) the Act does not expressly permit the Panel to grant "appropriate relief." Instead, the Act is silent as to any type of remedy, only mandating the Panel's decision "shall be final and binding." *Id.* Nor does the Act provide for a waiver of immunity from monetary damages through pre-litigation conduct. Because the *Sossamon* Court determined the authorization of "appropriate relief" was too ambiguous to imply a waiver of monetary damages through the acceptance of RLUIPA funds, the Court likewise holds that mere participation in the blind vendor program does not constitute an explicit waiver of immunity from monetary damages.

Even were the Court to apply a deferential standard—as opposed to de novo review—the Panel Majority unreasonably ignored binding precedent by failing to analyze the Act under *Sossamon.* Accordingly, the Panel Majority exceeded its authority by awarding Mr. Cyrus monetary damages. As such, the Panel Majority's award of pre and post-judgment interest was also improper. The Court hereby **OVERRULES** the Panel Majority with respect to its award of monetary damages, pre-judgment interest, and post-judgment interest.

## B. Did the Panel Majority Properly Award Prospective Relief?

BSVI contends the Panel Majority improperly awarded prospective relief by enjoining all grantors with vending facilities on state or county property from collecting commission payments from blind vendors. (Mot. for J. on the Admin. Rec. at 34). According to BSVI, "[a]t the time of the arbitration, OOD had already provided Cyrus the injunctive relief he requested with respect to the University [of Toledo]; namely, he no longer paid commission to the University, and the contract provision requiring commission payments was removed." (*Id.*). Therefore, BSVI contends any prospective relief with respect to the University of Toledo is moot. BSVI also argues that the Panel Majority's order improperly "involves dozens of entities

21

that were not parties in the panel arbitration (and some who were not even party to a contract with OOD)"—rendering it "arbitrary, capricious, and not in accordance with law." (*Id.*). Finally, BSVI avers that the AG's Opinion should not be applied to commission payments from vendors at county facilities.

Mr. Cyrus claims the Panel Majority's prospective relief award was proper. First, Mr. Cyrus avers his grievance was broad in scope, "challenging the unlawful practice of charging commissions to 'Blind Vendors' in Ohio." (Mot. to Enforce at 45). Mr. Cyrus cites his Complaint, in which he asked that "Respondent be compelled to take steps reasonable and necessary to ensure its future compliance with federal and state law." (*Id.* at 46). Second, Mr. Cyrus argues "the factual record before the panel demonstrated, without contradiction, that the Bureau's violations of the law were statewide." (*Id.*). Accordingly, Mr. Cyrus contends the Panel Majority did not exceed its authority by ordering OOD to notify all vendor sites that commission provisions are unlawful.

Mr. Cyrus also points out that arbitration panels "have broad discretion to fashion a remedy." (*Id.*) (citing *Decorative Panels International v. International Ass. of Machinists*, 996 F. Supp. 2d 559 (E.D. Mich. 2014); *Questar Capital Corp. v. Gorter*, 909 F. Supp. 2d 789 (W.D. Ky. 2012); *Brown v. Platta*, 563 U.S. 493 (2011)). Finally, Mr. Cyrus argues that—even if BSVI is immune from monetary damages—"every court that has found sovereign immunity to be a bar to an award of retroactive damages, has agreed that *at least* prospective relief is available." (Mot. to Enforce at 49) (emphasis in original) (citing *Ramsey*, 366 F.3d at 18).

The Court first notes that BSVI does not assert that sovereign immunity bars the Panel Majority's award of prospective relief. (BSVI Reply at 10). Therefore, the Court will not discuss whether the Eleventh Amendment renders state entities immune from injunctions under

the Act. Instead, the Court will review the Panel Majority's decision for an abuse of discretion. As stated *supra*, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or agency action that is "unsupported by substantial evidence." 5 U.S.C. § 706.

### 1. Prospective Relief – University of Toledo and State-Affiliated Universities

In its Opinion and Award, the Majority Panel notes that OOD's Grantor Agreement with the University of Toledo "was amended effective October 2016 to remove the obligation to pay a commission." (Arb. Op. & Award at 12). The Panel Majority also acknowledges that Mr. Cyrus stopped paying the commissions owed under the Bureau Grantor Agreement in May 2014, and that "neither the Bureau not the University has requested that Cyrus pay the commissions owed for the period May 2014 to October 2016." (*Id.* at 13). The Majority Panel concluded "these facts alone do not irrevocably relieve Cyrus of the effects of the obligation imposed by the [University of Toledo] Agreement." (*Id.*). Accordingly, the Panel Majority held the "record clearly demonstrates that, absent an adjudication of the Bureau's authority to impose a commission obligation on blind vendors, Cyrus has a reasonable and legitimate expectation that such commissions will be required by the Bureau as a condition of future opportunities even at priority sites." (*Id.* at 14).

This Court agrees. For one, BSVI noted in its pre-hearing briefing that the AG Opinion is not binding on the courts. (BSVI Pre-hearing Brief at 13, ECF No. 20-18) (citing *In re Swesey*, 112 F. Supp. 773, 778 (N.D. Ohio 1953)) ("the opinion of an Attorney General, while persuasive, is not conclusive or binding upon State officers or the Courts").[4] Thus, without the

---

[4] The Attorney General's Opinions are not binding precedent on courts. *State ex rel. Data Trace Information Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St. 3d 255, 268 (2012) ("Attorney General opinions are not binding on courts; at best, they are persuasive authority") (citing *State ex rel. Van Dyke v. Pub. Emps. Retirement*

imposition of prospective relief, Mr. Cyrus could once again become contractually bound to pay commissions in contravention of the Act. Furthermore, in its Reply brief, BSVI contends "the payment of commission[s] grows opportunities in Ohio for blind vendors." (BSVI Reply at 26). Such a comment suggests OOD will continue entering into Bureau Grantor Agreements with state-affiliated universities containing commission provisions—absent an injunction. Accordingly, the Court **ADOPTS** the Panel Majority's prospective relief enjoining grantors on state colleges or universities from charging commission payments.

### 2. Prospective Relief – Lucas County and Other County Properties

Next, the Court considers whether the Panel Majority's prospective relief was proper with respect to grantors on county properties. BSVI maintains the AG Opinion "only discusses vending facilities on state-affiliated colleges or universities," and that the Panel Majority improperly expanded the scope of the AG Opinion to cover county properties. (Mot. for J. on Admin. Rec. at 31). In addition, BSVI argues county property is not "governmental property" under the Mini Act, and therefore does not enjoy priority for blind vendor sites. (*Id.* at 30–31). Generally, BSVI avers, "[p]riority means that a facility must give preference to a licensed blind vendor, regardless of whether another vendor provides a more lucrative offer (such as including a commission)." (BSVI Reply at 21). According to BSVI, blind vendors must compete with private vendors on county sites—meaning commission payments drive the contractual agreements. (*Id.* at 22).

Mr. Cyrus and the Panel Majority disagree. In its Opinion and Award, the Panel Majority points out that the Act can apply to "other property," "which is defined to include 'property which is not Federal property and on which vending facilities are established or operated by the

---

*Bd.*, 99 Ohio St.3d 430 (2003)). In addition, a change in administration could shift the Attorney General's position regarding commission payments.

use of any funds derived in whole or in part, directly or indirectly, from the operation of vending facilities on any Federal property.'" (Arb. Op. & Award at 29) (citing 34 C.R.F. § 395.1(n)). Specifically, the Act directs the Secretary of Education to "[d]esignate as provided in section 107b of this title the State agency for the blind in each State . . . to issue licenses to blind persons who are citizens of the United States for the operating of vending facilities on Federal and other property in such State." 20 U.S.C. § 107(a)(a)(5). Consequently, OOD has the ability to enter Bureau Grantor Agreements with federal, state, county, municipal, and private locations. (Agency Hearing Tr. 71:14–72:22). The Panel Majority concluded that because BSVI derives federal funds from county facilities, they constitute "other property." (Arb. Op. Award at 30). The Panel Majority found "no basis to apply different rules to the County facilities." (*Id.*).

BSVI's arguments are well taken. The Act directed the Secretary of Education to designate a state agency to implement the program by "the operating of vending facilities on Federal and other property." 20 U.S.C. § 107(a)(a)(5). Consequently, a state may permit counties to serve as blind vendor sites. Yet, as BSVI accurately notes, the Act provides that "[i]n authorizing the operation of vending facilities on *Federal property*, priority shall be given to blind persons licensed by a State agency." 20 U.S.C. § 107(b) (emphasis added). Accordingly, to extend blind vendor priority beyond federal property, the state must pass its own legislation. Ohio did so in the Mini Act. However, the Mini Act only accords blind vendors priority on "governmental property"—including "any real property, building, or facility owned, leased, or rented by the state or any board, commission, department, division, or other unit or agency thereof." 33. O.R.C. § 3304.28(C).

The Mini Act's definition of "governmental property" does not include counties. Although counties may enter into Bureau Grantor Agreements with OOD, they are "not required

25

to accept OOD's contract." (BSVI Reply at 25). As a result, counties may properly entertain the most lucrative offers from both private and blind vendors—including the incentive of commission payments. Because the Panel Majority disregarded the distinction between county and state property under the Act and the Mini Act, its prohibition of commission provisions in county agreements was contrary to law. Therefore, the Court **OVERRULES** the Panel Majority's prospective relief award with respect to counties.

## C. Did the Panel Majority Properly Award Attorney Fees?

BSVI asserts two arguments against the Panel Majority's award of attorney fees. First, BSVI contends attorney fees are barred by sovereign immunity. (Mot. for J. on the Admin. Rec. at 21). Once again, BSVI argues "[a] waiver of sovereign immunity must be 'expressly and unequivocally stated in the text of the relevant statute.'" (*Id.*) (citing *Sossamon*, 563 U.S. at 290). BSVI points out the "Randolph-Sheppard Act contains no such language with respect to attorney's fees." (*Id.*). Second, BSVI argues that under the American Rule, "each party bears his own attorney's fees in the absence of certain limited exceptions." (Mot. for J. on Admin. Rec. at 22) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253). According to BSVI, the Supreme Court "expressly applied the American Rule to bar recovery of attorney's fees incurred during an administrative proceeding of the National Labor Relations Board." *Summit Valley Industry, Inc. v. Local 112, United Brotherhood of Carpenters and Joiners of America*, 456 U.S. 717, 721–722 (1982).

In *Summit*, the Supreme Court held that "even if attorney's fees are necessary to provide 'full compensation' to an employer, 'this justification alone is not sufficient to create an exception to the American Rule in the absence of express congressional authority.'" (Mot. for J. on Admin. Rec. at 25) (citing *Summit*, 456 U.S. at 724; quoting *F.D. Rich Co. v. United States ex*

*rel. Industrial Lumber Co.*, 417 U.S. 116, 128–129 (1974)). Relying on this precedent, BSVI argues the American Rule applies in the instant action because "[t]here is no specific and explicit reference to attorney's fees in the Act; attorney's fees are not mentioned at all." (*Id.* at 26).

Mr. Cyrus counters that, pursuant to the Sixth Circuit's decision in *Tennessee Dept. of Human Services*, sovereign immunity does not apply to the award of attorney's fees. (Mot. to Enforce at 43). In addition, Mr. Cyrus contends the American Rule does not apply to the arbitration proceeding in this case. (*Id.*). Again citing *Tennessee Dept. of Human Services*, 979 F.2d at 1169, Mr. Cyrus highlights the Sixth Circuit's determination that: "[t]he "American Rule" applies to the awarding of attorney's fees to parties that have litigated their cause *in the federal courts* and, therefore, does not apply to this case, which concerns the awarding of attorney's fees incurred during the arbitration process. (*Id.*) (emphasis in original). Finally, Mr. Cyrus argues the Supreme Court decided *Summit* in 1982—ten years prior to the Sixth Circuit's decision in *Tennessee Dept. of Human Services*. (*Id.* at 44).

### 1. Does the American Rule Apply?

"Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015). The Supreme Court has permitted departures from the American Rule only in "specific and explicit provisions for the allowance of attorneys' fees under selected statutes." *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260 (1975). However, as discussed by the Tenth Circuit in *Tyler*, 904 F.3d at 1194, not all circuits have "addressed the American Rule's application to administrative proceedings."

Notably, the Sixth Circuit considered this exact question in *Tennessee Dept. of Human Services*, 979 F.2d at 1169. As Mr. Cyrus accurately states, the Sixth Circuit found the American Rule does not apply to "attorneys' fees incurred during the arbitration process." *Id.* Moreover, the Sixth Circuit reaffirmed this rule in *WMA Securities Inc. v. Wynn*, 32 Fed. Appx. 726, 730 (6th Cir. 2002). Quoting *Tennessee Dept. of Human Services*, the Sixth Circuit asserted "[t]his Court has found the 'American Rule,' which generally allows for the award of attorneys' fees only when the statute or governing contract permits, inapplicable to arbitration proceedings." *Id.* As no Sixth Circuit or Supreme Court case has yet overturned this finding, the Court concludes the American Rule does not apply to Mr. Cyrus's arbitration proceedings under the Act.[5] The Court will next consider whether sovereign immunity bars the Panel Majority's award of attorney fees.

### 2. Does Sovereign Immunity Bar Attorney Fees?

As discussed *supra*, a waiver of sovereign immunity must be clear and unambiguous from the text of the statute. *Lane*, 518 U.S. at 192. This strict construction in favor of the sovereign also applies to awards of attorney fees. *See Ardestani v. I.N.S.*, 502 U.S. 129 (1991) (holding that even though attorney fees are explicitly permitted by the Equal Access to Justice Act ("EAJA"), deportation proceedings are not 'adversary adjudication' under section 554 for which the EAJA waives sovereign immunity from attorney fees). Here, the Act is equally silent regarding attorney fees as it is monetary damages. For the reasons stated above, the Court finds

---

[5] BSVI argues two cases have since overturned the *Tennessee* court's holding that the American Rule does not apply in arbitration proceedings. *See Crossville Med Oncology, P.C. v. Glenwood Sys, LLC*, 610 Fed. Appx. 464, 470 (6th Cir. 2015); *Wells Fargo Advisors, LLC v. Widener*, 2011 WL 6101626, No. 1:11-cv-163 (S.D. Ohio Nov. 9, 2011). However, as suggested by Mr. Cyrus, neither court confronted whether an arbitration panel could award attorney fees. (Mr. Cyrus Reply at 10). In fact, the award of attorney fees was not challenged in either case.

Ohio did not waive its sovereign immunity with respect to attorney fees. The Court **OVERRULES** the Panel Majority's award of attorney fees.

## D. Statute of Limitations

Finally, the parties dispute whether the Panel Majority applied the correct statute of limitations. BSVI argues the Panel Majority "erred by applying the six-year statute of limitations set forth in Ohio Rev. Code § 2305.07, which pertains to contracts not in writing and liabilities created by statute." (Mot. for J. on Admin. Rec. at 29). According to BSVI, the Panel Majority should have applied the two-year statute of limitations set forth in Ohio Rev. Code § 2743.16(A), which applies to "civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code." (*Id.* at 30). Furthermore, BSVI claims Mr. Cyrus's action was untimely under either statute of limitations. BSVI points out that Ohio requires a blind vendor to file his or grievance within 45 days of the allegedly improper action. (*Id.* at 29) (citing O.A.C. 3304:1-21-14). Here, BSVI argues Mr. Cyrus did not file a grievance regarding commission payments until April 20, 2015—years after he agreed to pay commissions in his 2006 and 2010 agreements. (*Id.*).

Mr. Cyrus contends the Panel Majority applied the correct statute of limitations, arguing that "O.R.C. § 2743.16 is part of a larger state statutory framework that waives state sovereign immunity and establishes a right to assert claims against the state of Ohio in its Court of Claims." (Mot. to Enforce at 27). According to Mr. Cyrus, the Ohio Court of Claims has no "jurisdictional involvement or other relationship to an arbitration proceeding arising under the Randolph-Sheppard Act." (*Id.*). Moreover, Mr. Cyrus asserts that his grievance was timely. (*Id.* at 30). Mr. Cyrus filed his grievance on April 29, 2014, fifteen days after the AG Opinion notified blind vendors that commissions are unlawful. (*Id.* at 31).

As noted by the Panel Majority, "[w]hen a federal statute contains no period of limitations, courts are directed to 'borrow' the most applicable state limitations period." (Arb. Op. & Award at 20). The Act does not establish a statute of limitations. Therefore, the Panel Majority selected a six-year period of limitations for "an action upon liability created by statute." O.R.C. § 2305.07. A "liability created by statute" under O.R.C. § 2305.07 is a liability that would not exist but for the statute. *McAuliffe v. Western States Import Co, Inc.*, 72 Ohio St. 3d 534, 537–538 (1995). Because Mr. Cyrus's right to an arbitration proceeding arose under the Act and the Mini Act, his action was created by statute. Moreover, the Panel Majority accurately notes that "[a]lthough Cyrus asserts a general breach of duty, there is no common law duty owed by the Bureau to Cyrus." (Arb. Op. & Award at 20).

Consequently, the Court finds the Panel Majority did not abuse its discretion in applying a six-year statute of limitations to Mr. Cyrus's action. In addition, the Court agrees with the Panel Majority that Mr. Cyrus's Complaint was timely because the reason for his grievance did not become apparent until April 29, 2014—fifteen days before he filed his Complaint. Accordingly, Mr. Cyrus's prospective relief with respect to state-affiliated universities and colleges is not barred by the statute of limitations.

## III.

Mr. Cyrus's Motion to Supplement the Administrative Record is unopposed by BSVI. (*See* ECF No. 33). Accordingly, the Court **GRANTS** Mr. Cyrus's Motion. (ECF No. 32).

## IV.

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** BSVI's Motion for Judgment on the Administrative Record (ECF No. 23); the Court **GRANTS in part** and **DENIES in part** Mr. Cyrus's Motion to Enforce Arbitration (ECF No. 28); and the Court

**GRANTS** Mr. Cyrus's unopposed Motion to Supplement the Administrative Record (ECF No. 32). Mr. Cyrus is entitled to injunctive relief in accordance with this Opinion and Order. The Clerk is **DIRECTED** to enter Judgment forthwith.

       **IT IS SO ORDERED.**

3-26-2019
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**